UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

AHMAD ISMAEL IBRAHIM and MOHAMMAD TAHIR

                                    Plaintiffs,

     -against-

NASSAU COUNTY, T20 WORLD CUP USA INC., GARDAWORLD SECURITY SERVICES MANAGEMENT COMPANY, INC., JOHN DOE ##1-4, JANE DOE, GEORGE DOE ##1-3

                                    Defendants.

**COMPLAINT AND JURY DEMAND**

------------------------------------------------------------------------ X

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiffs seeks relief for the violation of their rights secured by 42 USC § 1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

2. The claims arise in part from June 10 and June 12, 2024 incidents in which Nassau County police officers and International Cricket Council ("ICC"- named here as "T20 World Cup USA Inc.") security forces violated plaintiffs' First Amendment rights to display, view, or associate with Palestinian flags in a public forum where countless other nations' flags were welcomed and celebrated.  This was a blatantly unconstitutional policy of content-based and viewpoint discrimination.  Ahmad Ibrahim was ejected from the stadium grounds, crushing his lifelong dream of seeing his Native Bangladesh play a World Cup event on US soil, and he was arrested on trumped up charges and barred from the stadium by Nassau County.  The entire incident was caused by an explicit policy that Nassau County and the ICC jointly pursued to single out and bar Palestinian flags from an international sporting event while the eyes of the world watched.

3. Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. § 1983, and the First, Fourth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Eastern District of New York in that the events in question occurred within the boundaries of the Eastern District of New York.

## FACTS

6. Cricket is the second most watched sport in the world behind, of course, soccer. The ICC is the international governing body of cricket, headquartered in Dubai, United Arab Emirates. The ICC operates a biannual tournament called the T20 World Cup ("T20"); in it, 20 national teams, one from each participating country, battle over the course of about a month for the championship. The events are filled with national pride, rivalry and comradery, where attendees bring and display national flags and proudly declare their affinity for various nations and teams.

7. For 2024, Nassau County, Long Island, New York, in the United States, won the privilege of hosting a portion of the T20. It was intended as an exciting cultural event that brought diversity and culture to a portion of Long Island that hosts a large south Asian population- a region where cricket has historically been popular.

8. Nassau County played a significant role in planning and promoting the T20. The ICC and Nassau County entered into an agreement to work together to erect a temporary 33,000 seat cricket stadium on public Nassau County public parkland- the stadium was solely for the

purpose of hosting the T20 and allowing fans and people from diverse cultural and national backgrounds to gather, share and express their national pride and affinities, and watch the games. ICC chief executive Geoff Allardice lauded the T20's "power to unite diverse communities". Nassau County Executive Bruce Blakeman said "I look forward to bringing our many diverse communities together" to watch the events. The stadium was to be dismantled after the end of the tournament, leaving a permanent cricket field for ongoing use in the public park on which it had been erected.

9. The ICC and Nassau County worked together to promulgate and publicize rules and regulations concerning the T20. On May 31, 2024, the Nassau County Police Department released a media advisory concerning those rules. "Prohibited and Restricted Items" included "any items or messaging of a provocative, political and/or offensive nature" and "large banners and flags- nothing larger than 1.6 M. in length (approximately five feet)". In practice, on information and belief, only large Palestinian flags were barred- other flags- even larger than 1.6 meters long- were allowed in. For example, at the India/Pakistan match, fans were permitted to hang enormous India and Pakistan flags over the rails in front of the lowest rung of seating, and the Bangladesh-South Africa match had audience members with Bengali flags far in excess of 1.6 M proudly displayed. And in practice, not all political messaging was barred- for example at the same India-Pakistan match, an enormous flag advertising the "American Pakistani Advocacy Group" hung over the rail in front of the lowest rung of seating.

10. Prior to the tournament, Nassau County officials and ICC officials entered into an agreement and understanding that Palestinian flags would not be permitted at the T20. At the time and to this day, a tragic war was and is being waged between Israel and Hamas, the governing

3

Case 2:24-cv-04888-EK-SIL   Document 1   Filed 07/15/24   Page 4 of 17 PageID #: 29

authority in Gaza, part of the State of Palestine.[12] Although many nations were in various wars at the time of the T20, on information and belief, only Palestinian flags were prohibited at the T20. The flags of scores of other nations were proudly displayed by attendees, and permitted by police, security officers, and the ICC.

11. On-duty Nassau County Police Officers were tasked with enforcing the Palestinian flag ban in the first instance. Tournament attendees were required to first enter through a tent outside the stadium. There, they went through an initial screening where their tickets were scanned by ICC employees or subcontractors. Next, they went through magnetometers and a security check- also conducted by ICC employees or subcontractors. After that, they would exit the tent to walk across the grounds towards the stadium.

12. But there was one more gauntlet attendees needed to clear before getting to the stadium. Nassau County police officers were posted outside the tent, between the tent and the stadium. There, within the bounds of the property delegated to the ICC for the use of the tournament, these on-duty Nassau County officers visually checked attendees for any Palestinian flags. If they encountered any, they would instruct the attendees they could not bring the Palestinian flags into the stadium. Thus Nassau County police took an active and prearranged role in effectuating the unlawful restrictions.

13. All other flags were permitted. The officers had been erroneously trained, by the ICC and/or Nassau County, that because the T20 was a "private event", "freedom of speech doesn't

---

[1] Hamas is designated by the US Department of State as a "Foreign Terrorist Organization" under section 219 of the US Immigration and Nationality Act; the most immediate catalyst for the war was an atrocity perpetrated by Hamas, killing or kidnapping over 1000 Israeli civilians. In response, Israel has to date killed over 38,000 Palestinians, mostly civilians.

[2] The State of Palestine is formally recognized as a sovereign state by 145 of the 193 member states of the United Nations- including Bangladesh and South Africa. It has been a non-member observer state of the United Nations General Assembly since November 2012, and its flag flies in front of the United Nations in front of its headquarters in Manhattan.

4

exist inside" the temporary stadium on public parkland, because "people who are running the event decided they don't want it to be political". This explanation from one officer at the T20, among other things, made it plain that this was official Nassau County and ICC policy.

14. Inside the stadium, Gardaworld employees policed the audience for display of Palestinian flags, and confiscated any they saw, or forced attendees to put the flags away if they were displayed.

## AHMAD IBRAHIM

15. On June 10, 2024, Bangladesh was scheduled to play against South Africa at the Nassau County venue. Bangladesh is a predominantly Muslim country where a large majority of citizens are likely sympathetic and identify with Palestinians suffering enormously in the war between Israel and Hamas; Bangladesh has no diplomatic relations with Israel but does recognize and have diplomatic relations with the State of Palestine.

16. South Africa is a nation that in 1990 relatively peacefully renounced an official policy of apartheid- a formal policy of segregation and political, social and economic discrimination against its black majority population. South Africa's long governing party (until very recently) has often publicly compared Israel's treatment of Palestinians to South Africa's own treatment of black citizens during apartheid, and thus many South Africans also identify with Palestine.

17. Many activists, academics, and politicians have similarly likened Israel's historic actions towards the citizens of Palestine as apartheid, and South African officials have formally lodged complaints with the International Court of Justice, the United Nations' highest court, that Israel is committing genocide in its war in Gaza.

18. Mr. Ibrahim is an American citizen originally from Bangladesh. He works as a pharmacist in Philadelphia, where he lives with his wife and children. He was extremely excited that the T20 was being hosted by the United States in 2024, and thrilled when his brother procured tickets for them and their friends to attend the Bangladesh-South Africa match in New York. Prior to travelling to New York for the match, Mr. Ibrahim made a poster with his seven-year-old daughter to bring to the tournament. It contained a few hand-drawn flags and a heart, and essentially said, in flags and hearts, "Thank you, South Africa, love from Bangladesh", and had pictures of Palestinian flags. Mr. Ibrahim also brought with him a Palestinian flag, as did many other attendees of the T20.

19. Mr. Ibrahim, his brother and his friends entered the screening tent without incident. Their tickets to the game were scanned, and they proceeded through the security screening at the magnetometers.

20. Once they cleared the magnetometers and began walking towards the stadium, a Nassau County Police Officer approached Mr. Ibrahim and advised him he could not bring the poster into the stadium, twice advising him explicitly – once, and cooperatively and affably one more time for the camera, that "at this World Cup event, you're not allowed to have flags representing the country of Palestine".

21. Though disappointed. Mr. Ibrahim complied with the officer's directive. First he took a photo holding the sign at the event, to show his daughter back home.



Then Mr. Ibrahim surrendered the poster.

22. Next, Mr. Ibrahim asked his friend for the Palestinian flag, and asked the officer- now joined by other officers- if he could put it away but still retain it for the stadium- and just not display it. He was told no, and given the choice to discard it, pay $15.00 for a locker to store it in, or not enter the stadium.

23. At this point, several police officers were around Plaintiff, and though he peacefully argued the unfairness (and unconstitutionality) of the policy, he ultimately relinquished the flag to his brother, to store or discard. He himself did not want to discard the flag, as that would show disrespect to Palestine- the opposite of his intention in bringing the flag.

24. The officers had maneuvered Mr. Ibrahim back into the tent before the magnetometers. They were joined by, and consulted with and appeared to defer to, John Doe #1, a "Supervisor" with Gardaworld, a private security force hired, on information and belief, by the ICC to enforce their rules and regulations at the event. John Doe #1 explicitly reaffirmed to the officers and Mr. Ibrahim that the flag was not allowed in the event. Though Mr. Ibrahim was as polite as could be, John Doe #2 said of Mr. Ibrahim, "I don't want any more of his fucking mouth".

7

25.     Having complied with the officers' explicit directive to either discard the flag or not enter the stadium, Mr. Ibrahim reentered towards the stadium area, permitted to do so by the officers.

26.     As Mr. Ibrahim exited the screening tent towards the stadium, he called out, "Free, Free Palestine!" to which other attendees entering the tournament, who he did not know, called back, "Free, Free Palestine" in a spontaneous call and response.  Twice more, Mr. Ibrahim called out "Free, Free Palestine" as he walked towards the stadium.  The chant was not disruptive or unreasonable and, in fact, was a chant that was regularly made by attendees of the T20 matches entering the tournament, as evidenced in part by the ready response to his chant.  It was plain that Mr. Ibrahim's intent was not to cause public inconvenience, annoyance or alarm, nor did he recklessly creating a risk thereof; none of the approximately 50 people within view of the officers' body worn cameras seemed to react in any unfavorable way towards his statements,

27.     In retaliation for Mr. Ibrahim's exercise of his First Amendment rights, Nassau County police officers, including those named here, moved in and arrested Plaintiff.  John Doe #2 told Mr. Ibrahim a few minutes later "you know damn well why that (the flag) can't be in there". During Mr. Ibrahim's arrest processing, his arresting detective issued him a what purported to be a "trespass notice" in which the Nassau County detective advised him he was banned from the "Nassau County International Cricket Stadium" and would be arrested if he returned.  The officers knowingly arrested Plaintiff without probable cause; they worked together to falsely charge trespass, asserting he had been barred from entering when they knew he complied even with all their unconstitutional demands, and they falsely charged disorderly conduct when they knew none of the elements of such a charge were met.

28. Plaintiff spent a miserable 24 hours or so in custody before he was released with patently false charges of disorderly conduct and trespass.

MOHAMMAD TAHIR

29. Mr. Ibrahim was not the only person barred from displaying a Palestinian flag at the T20.  In fact, the Nassau County Police Department, working in concert with the ICC and Gardaworld, barred many others, throughout the T20, from bringing in Palestinian flags, and Gardaworld security officers confiscated Palestinian flags any time they were displayed inside the stadium, having escaped the notice of the Nassau County police officers posted outside the stadium.  Any person who wanted to retain their flag but attend the events had to pay $15.00 for a storage locker.

30. Plaintiff Mohammad Tahir is a cricket fan and himself a player, who eagerly travelled from South New Jersey to attend the Pakistan-Canada match on June 11, 2024.

31. Near the end of the match, people near Mr. Tahir attempted to display a Palestinian flag from their seats in the audience.  They asked Mr. Tahir to help them hold one side of the flag up, which he was more than happy to do, as he himself shared an affinity with the State of Palestine, as do many Pakistani Americans like him.[3]

32. As soon as the flag was lifted, three Gardaworld security officers approached and insisted it be put away, or it would be confiscated.

33. Mr. Tahir was disappointed and frustrated at having his ability to view the flag, to peaceably assemble, and to speak through display of the flag, impeded.

## PARTIES

---

[3] Pakistan has long been a strong supporter of Palestine.

9

34. Plaintiff AHMAD IBRAHIM ("Mr. Ibrabim") is a United States citizen and at all times here relevant resided in Phildalephia, Pennsylvania.

35. Plaintiff MOHAMMAD TAHIR ("Mr. Tahir") is a United States citizen and at all times here relevant lived in Cherry Hill, New Jersey.

36. NASSAU COUNTY ("the County") is a duly constituted municipal entity created and authorized under the laws of the State of New York.  The County is authorized by law to maintain a police department (the Nassau County Police Department, or "NCPD"), which acts as its agent in law enforcement, and for which it is ultimately responsible.  The County assumes the risks incidental to the maintenance of a police force and the employment of police officers.  At all relevant times, the County was responsible for the training, supervision, and discipline of law enforcement officers hired by the NCPD.

37. T20 WORLD CUP USA INC. ("the ICC") is the entity established in the United States to deliver the T20.  It is incorporated in the State of Delaware and authorized to do business in New York State.  The ICC's policies and actions in enforcing viewpoint discrimination at the T20 were under color of law, in that they were taken directly in concert with the County and the NCPD.

38. GARDAWORLD SECURITY SERVICES MANAGEMENT COMPANY, INC. ("Gardaworld") is a private security company contracted by the ICC to provide security services at the T20.  It is incorporated in the State of Delaware and authorized to do business in the United States.  Gardaworld's policies and actions in enforcing viewpoint discrimination at the T20 were under color of law, in that they were taken directly in concert with the County and the NCPD.

39. JOHN DOE #1 ("JD1") is a supervisor working for Gardaworld, who made direct decisions and acted in concert with John Doe ##2-4 and Jane Doe to prevent Mr. Ibrahim from

10

bringing a Palestinian flag or its likeness into the T20.  At all times here relevant, he acted under color of law, and is sued in his individual capacity.

40. JOHN DOE ##2-4 ("JD2" "JD3" "JD4") and JANE DOE are Nassau County Police Officers who interacted directly with Mr. Ibrahim, and in concert with each other and JD1, as agents of Nassau County and the ICC, to further Nassau County and the ICC's policies banning Palestinian flags or their likeness at the T20.  Though Mr. Ibrahim does not yet have their full names or identifying numbers, they wore name tags or are identified in Court papers partially identifying them as Police Officers Shannon, Beaudry, Labate, and Dolan.  They are sued in their individual capacities for false arrest in that they fabricated charges against Mr. Ibrahim and arrested him without probable cause.

41. GEORGE DOE ##1-3 ("GD1" "GD2" and "GD3") are Gardaworld security officers who interacted directly with Mr. Tahir or the men he lifted a flag with, and who acted in concert with each other and as agents of Nassau County and the ICC, to further Nassau County and the ICC's policies banning Palestinian flags or their likeness at the T20.  They are sued in their individual capacities for acting under color of law to deny Mr. Tahir his First Amendment rights.

42. At all times here mentioned defendants were acting under color of statutes, ordinances, regulations, policies, customs and usages of Nassau County and New York State.

## CLASS ACTION ALLEGATIONS

43. Plaintiffs seek to represent a class pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure.  The class consists of all persons who were barred from displaying a Palestinian flag at the T20 in Nassau County, New York, or who were prevented from viewing a Palestinian flag at the T20 in Nassau County, New York and thus had their "reciprocal right to receive" any message it sends.

11

44. The members of the classes are so numerous as to render joinder impracticable.

45. Upon information and belief, more than one hundred people are members of the proposed classes.

46. Upon information and belief, many class members who had their rights violated by the unconstitutional policies and practices described have not pursued individual claims due to the difficulty of pursuing litigation and fear of retaliation by law enforcement, employers, and schools.[4]

47. The class members' claims share a number of common questions of law and fact, including, but not limited to:

    a.    The degree to which the stadium erected on Nassau County public parkland was a public forum, designated public forum, limited public forum, non-public forum, or something else, for First Amendment purposes, and the level of scrutiny that speech restrictions therein should thus be subject to;

    b.    Whether Nassau County, the ICC, and/or Gardaworld adopted a policy and/or implemented a custom or practice of banning Palestinian flags from the stadium;

    c.    If either of the three had such a policy, the degree to which the three entities conspired or acted in concert to pursue such policy;

    d.    Whether such a policy violated the level of First Amendment scrutiny applicable to the forum;

    e.    The degree to which Nassau County, the ICC and Gardaworld, and Nassau County, Gardaworld and the ICC's agents, acted under color of law in enforcing their policy against Palestinian flags in the stadium;

---

[4] The threat to the livelihood and education of advocates for Palestine is far from hypothetical- the examples are legion, but in just the last week, the New York Times reported that at the law firm Sullivan & Cromwell, "for job applicants, participation in a protest — on campus or off — could be a disqualifying factor. The firm is scrutinizing students' behavior with the help of a background check company, looking at their involvement with pro-Palestinian student groups, scouring social media and reviewing news reports and footage from protests." Emily Flitter, *A Wall Street Law Firm Wants to Define Consequences of Israel Protests*, N.Y. Times, (July 8, 2024), https://www.nytimes.com/2024/07/08/business/sullivan-cromwell-israel-protests.html

12

48. Plaintiffs' claims are typical of the class, in that they were valid ticket holders who were barred from displaying a Palestinian flag and prevented from viewing the display of Palestinian flags at the T20.

49. The harms suffered by plaintiffs are typical of the harms suffered by the class members.

50. Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the plaintiff class and will fairly and adequately protect the interests of the class.

51. Plaintiffs are represented by Stoll, Glickman & Bellina, LLP ("SGB"). The named partners of Plaintiff's counsel are experienced attorneys with more than 75 years of combined litigation experience.

52. Each partner of SGB has litigated dozens of § 1983 actions in federal court. Andrew Stoll has appeared as class counsel in other class action lawsuits and has been directly involved in complex combined protest litigation in the Southern District of New York which included multiple lawsuits and classes, several non-profits, the New York Attorney General's office, and Corporation Counsel.

53. The partners at SGB have been involved in other First Amendment and protest related § 1983 litigation in the Eastern and Southern District of New York, including several matters arising from the Occupy Wall Street protests and the Black Lives Matter protests.

54. The partners at SGB have extensive trial experience; Andrew Stoll has tried approximately 35 jury trials in New York State courts, as well as every federal district court in New York. Nicole Bellina has conducted over 20 jury trials, also in New York State courts and every federal district court in New York.

55.     Plaintiffs' counsel has the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

56.     A damages class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## DAMAGES

57.     As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

a.  Violation of their rights pursuant to the First Amendments to the United States Constitution to speak freely and peaceably assemble and to receive messages; and pursuant to the Fourth Amendment of the Unites States Constitution to be free from an unreasonable search and seizure;

b.  Violation of their rights to Due Process of Law under the Fourteenth Amendment to the United Stated Constitution;

c.  Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

d.  Loss of liberty;

e.  Physical pain and suffering.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 (First Amendment) as to all Plaintiffs Against Nassau County, the ICC, Gardaworld, John Doe #1, and George Doe ##1-3

58.     The above paragraphs are here incorporated by reference.

59.     In committing the acts and omissions complained of here, the defendants acted under color of law, individually and in concert, to deprive plaintiffs of the rights protected by the

14

First Amendment to the United States Constitution by barring plaintiffs from engaging in protected speech in a public forum, and by depriving plaintiffs of the reciprocal right to receive that speech.

60. There was a plan, prearrangement, conspiracy, custom, or policy shared between all the defendants to enforce the unconstitutional viewpoint discrimination and practices described above, and the defendants acted together with or obtained significant aid from Nassau County in furtherance of restricting Palestinian flags at the T20.

61. The ICC, Gardaworld, John Doe #1, and George Doe ##1-3 were willful participants in joint activity with Nassau County and its agents.

62. Nassau County so far insinuated itself into a position of interdependence with the ICC, Gardaworld, John Doe #1, and George Doe ##1-3 that they were "pervasively entwined" and must be recognized as joint participants in the unconstitutional policies and practices described above.

63. Nassau County, the ICC, Gardaworld, John Doe #1, and George Doe ##1-3 shared a common goal of preventing attendees of the T20 from displaying or viewing Palestinian flags.

64. As a result of the foregoing, plaintiffs were denied the opportunity to express or receive viewpoints important to them, suffered emotional distress, incurred financial expenses, and were denied the opportunity to peaceably assemble, and to hear speech that they may or may not agree with or that they may or may not find inspiring, informative or educational.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 (False Arrest) as to Plaintiff Ahmad Ibrahim
against all Defendants

65. The above paragraphs are here incorporated by reference.

66. John Doe ##1-4 and Jane Doe acted under color of law and arrested Plaintiff without probable cause or other privilege, depriving him of his Fourth Amendment privilege against unreasonable search and seizure.

67. Nassau County, the ICC, and Gardaworld are liable for Plaintiff's false arrest because it resulted from their unlawful and unconstitutional policies and training deficiencies described above.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally, as follows:

A. In favor of plaintiffs in an amount to be determined by a jury for each of their causes of action;

B. Awarding plaintiffs punitive damages in an amount to be determined by a jury;

C. Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:   Brooklyn, New York
         July 15, 2024

                                        Very truly yours,

                                        Stoll, Glickman & Bellina, LLP
                                        By: Andrew B. Stoll
                                        Attorney for Plaintiff
                                        300 Cadman Plaza West, 12th Floor
                                        Brooklyn, NY  11201
                                        (718) 852-3710
                                        astoll@stollglickman.com

17